UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| NATIONAL FISH & SEAFOOD, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| KATHLEEN A. SCANLON, TAMPA BAY FISHERIES, INC., ROBERT PATERSON, MARK PANDOLFO, MARK MARSH, and JOHN DOE, | ) ) ) ) ) | Civil Action No. 1:18-cv-11515-LTS |
| Defendants. | ) ) ) | |

ORDER ON MOTION FOR PRELIMINARY INJUNCTION

September 14, 2018

SOROKIN, J.

Shortly after this case began, the Court enjoined Defendant Kathleen Scanlon from working at Defendant Tampa Bay Fisheries ("Tampa Bay") while the parties presented the disputed issues to the Court. Doc. No. 11. The Court has received and reviewed the original and supplemental pleadings filed by the parties, as well as testimony and exhibits presented at the evidentiary hearing on September 12, 2018. Plaintiff National Fish & Seafood ("National Fish") now requests a Court Order enjoining Scanlon from working at Tampa Bay for the remaining duration of this case, while proposing an expedited trial date. Doc. No. 4.

The Court makes the following factual findings. Scanlon worked for National Fish for twenty-three years as Director of Research and Development and Quality Assurance. On June 14, 2018, Robert Paterson, the chief executive officer of Tampa Bay, sent Scanlon a text message to ask whether she was interested in taking a position with Tampa Bay as director of

food safety or, if not, whether she could recommend suitable candidates. Scanlon unsurprisingly expressed interest. Former National Fish president Jack Ventola had recently been convicted of tax fraud and was soon to report to federal prison. Scanlon's elderly parents lived in Florida within commuting distance of Tampa Bay's offices. Paterson and Scanlon met on June 29 and quickly reached an agreement for Scanlon to begin work at Tampa Bay on July 23. Scanlon did not, at that point, notify her employer of twenty-three years that she intended to leave in just over three weeks to take a job with a competitor.

Beginning after Paterson's June 14 inquiry, but before Scanlon's June 29 meeting with Paterson, and continuing over a period of days, Scanlon copied literally thousands of documents from National Fish's computer system both onto her USB drive and into to a newly established Gmail account. Scanlon copied files, email folders and individual emails. These documents include recipes, cost analyses, policy documents, current and former product specifications, and a slew of documents regarding Whole Foods Markets, a major National Fish customer. The Whole Foods documents themselves took approximately an hour to copy on July 9. Scanlon's copying continued through July 11, 2018, the day on which she finally informed her long-time employer of her plans and her last day of work there.

Scanlon explained at the hearing on September 12 that, prior to accepting the position with Tampa Bay, she had had no personal email address and no personal computer devices such as a computer, phone or tablet. As a result, all of her personal information accumulated over the last two decades was stored on National Fish's computers and servers. This testimony is plainly true.

Scanlon further testified that she is not facile with computers, was "desperate" to preserve her personal information, and simply copied information without knowing what she was taking,

hoping to be sure she had her personal information. She testified that she cannot explain the copying or how these files ended up on the USB drive. Because the Court finds this testimony from Scanlon incredible and not believable, it rejects it. Scanlon copied far too many files from far too many folders. Plaintiff's forensic examination of the USB drive Scanlon used produced a log of files copied onto the drive, which shows the name of each file, the date and time at which the file was copied, and the date and time at which the file was last modified. The log, which was admitted as Exhibit 43 at the September 12, 2018, hearing, shows several days of file copying before she began to copy any personal files.

During the period from June 29 to July 11, Scanlon repeatedly sought assistance from Defendant Mark Marsh, Tampa Bay's IT director, with the copying of her personal information, but she never sought assistance from National Fish's IT director, with whom she had worked for years. She had no explanation whatsoever for this decision.

During the same period, Scanlon sent documents to a newly created Gmail account for, in her word, "holding." And she sent a National Fish document that had recently been created at her direction to Tampa Bay employees to assist them in using new software that she recommended they purchase.

Finally, on her second to last day of work at National Fish, she took photographs of portions of the clam processing line at National Fish, despite clear signage prohibiting such photography, a longstanding National Fish policy against such photography, and her own statement in a meeting earlier that day that referred to the photography ban. When asked, Scanlon testified she did not know why she took the photographs.[1]

---

[1] The Court rejects Scanlon's uncorroborated assertion that a customer once took one photo of the line with the permission of the head of National Fish. In any event, that kind of photography would be wholly different than the director of R&D taking multiple photos on her second to last

Scanlon was an at-will employee of National Fish. However, the terms and conditions of the company handbook were nonetheless contractual obligations during the term of her employment. See O'Brien v. New England Tel. & Tel. Co., 422 Mass. 686, 691 (1996) ("a personnel manual . . . becomes part of the employment contract . . . if, during the course of at-will employment, the parties agree, orally or in writing, that thereafter their rights and obligations would include the provisions of an employee manual"). Scanlon signed a document acknowledging receipt of the handbook on March 19, 2018. Although the document said that "nothing in the Policy Statements should be considered an employment contract or part of an employment contract," the document also stated, "I agree to follow the company's policies and to conform to its rules and regulations." As a result, the Court concludes at this stage that the handbook constituted at least the rules of her employment to which she had agreed to comply in exchange for continued employment.

The rules required employees, among other things, to maintain "access control measures" to National Fish computer systems; informed employees that access to National Fish computer systems was "restricted to active users and active user accounts only"; prohibited "dissemination of Company records containing trade secrets, confidential information, client records, customer records, or personal information about employees," including "any Company proprietary information, technical data, inventions, intellectual property, trade secrets or know-how," "research and product development information, product plans, products and services, . . . pricing, margins, sales allowances, discounts and pricing policies, invoices, marketing and product information, sales data for any employee, product, or Customer," and more; informed

---

day of work before leaving for a competitor after spending ten days copying many company files.

employees that National Fish's email system "should be used for business purposes only"; prohibited "[p]ersonal use of the e-mail . . . system"; informed employees that "communications entered into the Company's e-mail system . . . are Company property" and allowed disclosure "only to authorized employees"; and prohibited "retriev[ing] any stored information on the Company's information systems" without authorization.

Scanlon did not comply with these rules during the period in question. Scanlon copied documents from National Fish's computer system plainly with the intent to keep the documents for future use. As a result, her copying of company information onto her USB drive and forwarding company information to her personal Gmail account violated the rules' prohibitions on dissemination of company records, retrieval of company information without authorization, and personal use of the company email system. Similarly, her providing Defendant Marsh with TeamViewer access to her National Fish tablet and physical access to her National Fish iPhone violated the rules' requirement that employees maintain access control measures and allow disclosure of National Fish information only to authorized employees.

Although much of the information she took was merely company information, at least two documents she copied constitute trade secrets or protected confidential business information. Under Massachusetts law, recipes are trade secrets. See Peggy Lawton Kitchens, Inc. v. Hogan, 18 Mass. App. Ct. 937, 939 (1984). Similarly, the costing information was sufficiently protected confidential business information. By storing these documents on a password-protected system that provided users with different levels of access so that only individuals with business need could access given files, Doc. No. 34 at 8-9, National Fish sufficiently protected them. That these documents lack a marking that specifies their confidentiality is insufficient to defeat protection because, consistent with National Fish's policy that *all* company documents of certain kinds

5

were confidential, a restrictive stamp or other marking was not required. See CVD, Inc. v. Raytheon Co., 769 F.2d 842, 853 (1st Cir. 1985) (relying on the lack of confidential marking where company policy explicitly required that confidential documents be marked as such).

National Fish's claims against Tampa Bay stand in a different factual posture than its claims against Scanlon. Although Scanlon performed the actions described above, individual Defendants affirm under oath that neither Tampa Bay nor they individually sought or obtained National Fish's documents or confidential information, other than two received emails that did not contain recipes or cost information and have been quarantined. Defendants also deny under oath directing, encouraging or knowing of Scanlon's efforts to copy National Fish documents. Several facts warrant further inquiry given the Court's conclusions regarding Scanlon's activities. Defendant Marsh (1) copied the contents of Scanlon's National Fish iPhone onto a Tampa Bay computer so that he could later set up a Tampa Bay iPhone for Scanlon by loading it with the data from her National Fish iPhone; (2) suggested that Scanlon download TeamViewer onto her National Fish tablet so that he could assist her with copying her personal files; and (3) remotely logged into Scanlon's National Fish tablet with TeamViewer login credentials provided by Scanlon to assist her in copying her personal files. Notably, the forensic evaluations done by National Fish do not suggest, much less establish, that Marsh was involved in copying National Fish company information. Marsh stated in an affidavit under oath that he merely spent a short amount of time as a courtesy trying to help Scanlon copy her personal information such as contacts and photographs and that his transfer of iPhone information essentially involved a backup and restoration of encrypted information to which he lacked access.

Several other facts bear mention. Most of Scanlon's copying to the USB drive occurred after her last visit to Tampa Bay's office. An examination of Scanlon's email accounts, with the

6

two minor exceptions noted above, reveals no sending of files to Tampa Bay. The devices Scanlon possessed and the files Scanlon copied are either in National Fish's possession or quarantined. Scanlon was not subject to an ongoing employment agreement, non-competition agreement or non-disclosure agreement. Given that her employment agreement did not include such a restrictive covenant, retroactively adding one at this point would be "inherently inequitable," particularly because "even the grant of a preliminary injunction itself is an 'extraordinary and drastic remedy.'" See Boston Sci. Corp. v. Lee, No. 13-cv-13156-DJC, 2014 WL 1946687, at *6 (D. Mass. May 14, 2014) (quoting Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011)). In addition, National Fish has not identified damages or harm beyond the harm that would result if its competitor gains access to its confidential business information.

In light of the foregoing circumstances, the Court finds that National Fish has met its burden to establish each of the four-part test applicable to the injunctive relief awarded below for the period the relief is awarded. See Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013) ("In determining whether to grant a preliminary injunction, the district court must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest."). Accordingly, the Court preliminarily ENJOINS Defendant Scanlon from (1) viewing or otherwise using any of the National Fish documents that were copied from National Fish computer systems; (2) using the information contained within the recipes and cost information documents that were copied from National Fish computer systems, whether or not such use involves viewing or otherwise using the copied documents; and (3) beginning

7

employment at Tampa Bay. The Court also temporarily ENJOINS Tampa Bay and individual Defendants from viewing or otherwise using any National Fish documents copied by Scanlon, to the extent, if at all, that they possess or have access to any such document. These Orders remain in effect until the Court issues the further ruling described below.

Given the Court's findings and the applicable law, the Court also ORDERS the following:

1. Defendants shall make Defendant Marsh available for deposition by October 3, 2018, unless Plaintiff waives such deposition.
2. No later than September 18, 2018, the parties shall either (a) agree upon an independent third-party forensic expert to conduct an examination of Tampa Bay's computer systems or (b) submit a status report with each party proposing one name and briefly the reasons therefor, after which the Court will select the independent expert.
3. No later than September 21, 2018, Defendant Tampa Bay shall provide Plaintiff with a list, signed under oath by a corporate representative of Tampa Bay, of electronic devices that have been physically connected to USB Drive 1, Scanlon's National Fish iPhone, Scanlon's National Fish tablet, or other devices, if any, provided by Scanlon to Tampa Bay between June 1, 2018, and August 31, 2018.
4. The independent expert shall forensically examine Tampa Bay's email servers for emails from Scanlon sent between June 1, 2018, and August 31, 2018. The independent expert shall forensically examine for any National Fish files copied by Scanlon (a) Tampa Bay's network drives and (b) the Tampa Bay devices identified in response to paragraph 3, excluding the devices already in Plaintiff's possession. The expert shall complete the

examination and disclose the results simultaneously to all parties no later than October 3, 2018. The two entity parties shall bear equally the cost of this examination.

5. Plaintiff shall make a supplemental filing by October 9, 2018, as to further relief, if any, the reasons therefor, and a proposed schedule for the remainder of the litigation, with Defendants' response due by October 15, 2018. Based on these filings, the Court will determine what, if any, further relief is required, whether to dissolve the order prohibiting Scanlon from beginning employment at Tampa Bay, and the schedule for the remainder of this litigation. If the Court does not dissolve the order prohibiting Scanlon from working at Tampa Bay, trial will commence on November 26, 2018.

SO ORDERED.

    /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge